**E-FILED**
Tuesday, 10 August, 2010  03:11:51 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

DAVID A. PISTOLE,                     )
                                      )
            Plaintiff,                )
                                      )
      v.                              )          Case No. 09-1234
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security       )
Administration,                       )
                                      )
            Defendant.                )

## O R D E R

This matter is now before the Court on Plaintiff's Motion for Summary Reversal and the Commissioner's Motion to Affirm.  For the reasons set forth below, Plaintiff's Motion for Summary Reversal [#14] is DENIED, and the Commissioner's Motion to Affirm [#16] is GRANTED.

## BACKGROUND

Plaintiff, David Pistole ("Pistole"), was 30 years' old at the time of his administrative hearing.  (R309) He is 5'10" and weighs approximately 280 pounds.  Id.  He is not married and has no children.  Id.  He lives with his brother in a house.  Id.  Pistole was driven to the hearing by his aunt.  Id.  He has not used alcohol or drugs since the end of 2005.  (R315) He has a high school diploma and can read and write in the English language.  (R311) Pistole last worked as a salesman/stocker for the Walmart Store in December 2006.  Id. In the past, he was employed performing front desk work, night auditing, and housekeeping

in a hotel, working for a janitorial service, and setting up/serving at catering events. (R313-13)

Pistole claims that he is unable to work because he has anxiety attacks, starts hearing voices, and cannot function. On March 3, 2006, he applied for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging disability that began on July 16, 2005.[1] His application was denied both initially and on reconsideration. Pistole requested a hearing before an administrative law judge ("ALJ"). A hearing was held before ALJ Barbara Welsch on February 1, 2007, at which Pistole, who was represented by counsel, and vocational expert ("VE") Dennis Gustafson appeared and gave testimony.

At the time of the hearing, Pistole was taking medications for his condition. (R314) He testified that the medications were helping him and that he did not suffer any side effects from his medications. Id. His brother reminds him to take his medications. (R321) He sees a psychiatrist, who prescribes his "mental medicine" every three months, talks to a counselor every week, and sees the counselor every other week. (R315)

On a typical day, Pistole testified that he stays up late with his brother, who works second shift, so he doesn't get up until about 11:00am or Noon. (R316) He fixes lunch for his brother and does a little bit of house cleaning or laundry until he gets tired and has to lay back down for a couple of hours. Id. He watches TV until his brother gets home and then fixes dinner. Id. Pistole can do laundry, dishes, grocery shop, mow/weed the lawn, and take care of his two dogs. (R316, 318-19) He is able to feed, bathe, and dress himself. (R318) He has a valid driver's license and drives himself to the grocery store once or twice

---

[1] Pistole subsequently amended his onset date to February 1, 2006.

a week.  (R316)  He also attends church at least once or twice a week and is able to use

a computer to go online.  (R317-18) He enjoys going to movies and playing video games

on X-box.  (R319)

Pistole stated that he does not see his other family members very often because he

just doesn't feel up to it.  Id.  He feels depressed because he doesn't have a job and "can't

really do anything with them."  Id.  He mostly stays home because he gets worried about

a lot of people being around him.  (R320)

The ALJ posed a hypothetical question to the VE:

> Q: I would like you to assume an individual who's 30 years old
> with a high school education, past relevant work as you have
> outlined, an individual who has no exertional limitations, but
> would be limited to jobs which are routine and repetitive in
> nature without contact with the public and no work at
> unprotected heights or around unprotected hazardous
> machinery. How would these restrictions [sic] the performance
> of the past relevant work?
>
> A: Okay.  Jobs with no public contact essentially would meet
> that and be routine.  The cleaner commercial or institutional the
> housecleaner I'm going to rule out because in a hotel you're
> going to contact the public from time to time.
>
> Q: Okay.
>
> A: The cook/helper would be consistent with that.
>
> Q:All right.  And by no contact with the public I probably should
> have said no interaction with the public.
>
> A: Right.
>
> Q: Meaning the public could be around, but no interacting with
> them.  Is that how you understood it?
>
> A: Yes, that's essentially - -
>
> Q: Okay.

A: - - yeah.

Q: Okay.  All right.

A: The cook/helper would be consistent with that as would be the sandwich maker.  The job that was described in the industrial job, I put under material handling because it indicated it was a heavy job, but probably as it was performed it wasn't skilled and it appeared to be routine - -

Q: Okay.

A: - - as some material handling jobs would be.  The classification is up to an SVP of 3 for more complex material handling.  The job as described I believe would meet that hypothetical.

Q: All right.

A: Those would be the ones.

Q: If we go to the area of unskilled entry-level jobs can you give me some examples that would fit the hypothetical?

A: Again, are we talking about routine repetitive?

Q: Yes.

A: And no public interaction?

Q: Correct.  And no - -

A: Heights or machinery?

Q: Right.  And you can - - if you have numbers for like the commercial cleaner, etc., we can use those also.

A: All right.  That would be single biggest area.  It'd be under building cleaners.  These are all state of Illinois approximate figures.  Heavy, 6,168, medium 51,401, light 11,308.  Also indicated cook/helper, okay I would put that at medium 5,387. These would be unskilled food prep workers, light 3,279.  Then there would be dishwashers, medium 8,096, light 3,988.  I think the bulk of the rest of the jobs are going to be in manufacturing.

- 4 -

Q: Do you want to just give me one example?

A: Okay.  Hand packaging work, heavy 3,964, medium 7,078, light 13,873.  And then there would be 849 sedentary.

(R321-23)

Pistole's attorney then asked the following questions:

Q: Mr.Gustafson, let me start by if I add a couple of factors to the hypothetical tell me if it would change your answers.  If I were to include the no contact with co-workers as well as the public so the person would have to work in an isolated setting what impact would that have?

A: That would pretty much rule out any of the jobs I indicated except cleaner - - building cleaner.

Q: Okay.  Now if I added to the hypothetical no production quotas or expectations or requirements to complete a certain number of tasks during a period of work time what impact would that have?

A: Well all jobs would have such a requirement.  It varies depending on the time-frame that the job performance is assessed by, whether it's hourly or an entire shift, but every job would have a requirement of what would be expected to be completed within a period of time.

Q: Okay.  Now the numbers in the sources that you gave me for example the building cleaners and you gave me I think it was heavy, 6,178 and 51,401 medium are those specific DOT numbers or are those census classifications under the ONET system?

A: Those are census classifications which there would be multiple DOT.

Q: Would that be true of each of the areas that you cited in there?

A: Yes, it would.

(R324-25)

On April 17, 2007, the ALJ issued her decision.  (R269)  The ALJ found that Pistole has severe mental impairments that have been variously diagnosed as bipolar disorder, depression, anxiety, and schizophrenia, as well as polysubstance abuse including alcohol, cocaine, crack, marijuana, and acid.  (R275)  The ALJ determined, however, that Pistole does not have an impairment or combination of impairments listed in or medically equal to one listed in 20 CFR Part 404, Subpart P, Appendix 1.  Id.  She recognized impairments posed by Pistole's mental conditions, including both manic and depressive episodes that would satisfy the A criteria under Listing 12.04 (bipolar disorder or other affective disorders).  Id.  However, the B criteria were not satisfied under Listing 12.04, 12.03 (Schizophrenia, paranoia or other psychotic disorders), or 12.06 (anxiety) because Pistole at most demonstrated a mild restriction in activities of daily living, moderate difficulties in maintaining social functioning (primarily while engaged in substance abuse), moderate difficulties in maintaining concentration, persistence, or pace (primarily due to substance abuse and failure to take medication as prescribed), and no evidence of repeated episodes of decompensation of extended duration.  (R275-77)  Pistole further failed to satisfy the C criteria, which require a medically documented history of a chronic affective disorder of at least two years' duration causing more than a minimal limitation on the ability to do basic work, and either repeated episodes of decompensation of extended duration, a residual disease process resulting in such marginal adjustment that minor changes would predictably cause decompensation, or a current history of more than one years' inability to function outside a highly supportive living arrangement.  (R278)

After considering the medical evidence in the record and relevant credibility factors as a whole, the ALJ found that Pistole retained the residual functional capacity ("RFC") to perform work which is routine and repetitive in nature with no interaction with the public and which does not require working at unprotected heights or around unprotected hazardous machinery.  (R278-79)   The ALJ concluded that Pistole's medically determinable impairments could reasonably be expected to produce the alleged symptoms, especially when exacerbated by substance abuse.  (R280) However, his assertions regarding the intensity, persistence, and limiting effects of the symptoms were found to be not credible to the extent that they are inconsistent with the RFC assessment.  Id.

Past relevant work as a janitor/commercial cleaner was found to be possible.  (R297) Based on a consideration of his age, education, work experience, and residual functional capacity, the ALJ concluded that although Pistole's ability to perform work on all exertional levels has been compromised by non-exertional limitations, the testimony of the VE established that he was capable of making a successful adjustment to work that exists in significant numbers in the national economy and that he was not under a disability as defined under the Social Security Act at any time since her alleged onset in September 2002.  (R297-99)

Pistole submitted a Request for Review of Hearing Decision.  On June 16, 2009, the Appeals Council declined review of his claim, and the ALJ's decision became the final decision of the Commissioner.  (R1-4)  This appeal followed.  The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

In order to be entitled to SSI and/or DIB, a plaintiff must show that his or her inability to work is medical in nature and that he or she is totally disabled.  Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits.  *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process.  First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382(c)(a)(3)(A).  Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment.  McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980).  That factual determination is made by using a five-step test.  *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows:  (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled.  A negative answer at any point, other than

at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580 (1986).

In his appeal, Pistole raises essentially three claims: (1) the ALJ erred by substituting her opinion for that of the treating physicians and ignoring an entire line of evidence that was contrary to her findings; (2) the vocational testimony was insufficient due to the failure of the ALJ to include all of Pistole's limitations in the hypothetical; and (3) new and material evidence was submitted requiring a remand for further review.

Pistole argues that the ALJ ignored a whole line of contrary evidence and erroneously discounted the opinions of his treating physicians. The Seventh Circuit has recognized that a treating physician's opinion is not binding on the Commissioner. <u>Whitney v. Schweiker</u>, 695 F.2d 784, 788 (7th Cir. 1982). However, there is no presumption of bias against a treating physician's disability opinion. <u>Edwards v. Sullivan</u>, 985 F.2d 334, 337 (7th Cir. 1993). Rather, the ALJ, as the trier of fact, must consider the treating physician's possible bias. <u>Id.</u> The Commissioner will not give controlling weight to the treating physician's opinion on the nature and severity of the claimant's impairments unless the treating physician's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and consistent with substantial evidence in the record. 20 C.F.R. § 416.927(d)(2); <u>Moss v. Astrue</u>, 555 F.3d 556, 560 (7th Cir. 2009).

> In short . . . it is up to the ALJ to decide which doctor to believe -- the treating physician who has experience and knowledge of the case, but may be biased, or that of the consulting physician, who may bring expertise and knowledge of similar cases -- subject only to the requirement that the ALJ's decision be supported by substantial evidence.

<u>Micus v. Bowen</u>, 979 F.2d 602, 609 (7th Cir. 1992).

It is also the province of the ALJ to resolve evidentiary conflicts. <u>Ehrhart v. Secretary of Health and Human Services</u>, 969 F.2d 534, 542 (7th Cir. 1992); <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." <u>Walker v. Bowen, 834 F.2d 635, 640</u> (7th Cir. 1987). The existence of an evidentiary dispute is not grounds for reversing the ALJ's decision to credit one version of facts over another. <u>Herr v. Sullivan</u>,

912 F.2d 178, 181 n.4 (7th Cir. 1990)  However, the ALJ must explain with particularity the basis of his decision.  Young v. Secretary of Health and Human Services, 957 F.2d 386, 393 (7th Cir. 1992).

Pistole asserts that the findings of Dr. Arun Pinto, his treating psychologist, and Dr. Narayana Reddy, his treating psychiatrist, should have been given controlling weight, resulting in a finding of disability.  Pistole's first psychiatric hospitalization was from April 12, 2005, to April 18, 2005, resulting in a diagnosis of bipolar disorder.  (R596) After treatment with Risperdal and Lexapro, the psychosis and hallucinations had cleared up and Pistole was deemed by Dr. Baljit Singh to be "much more stable" with a fair prognosis and a Global Assessment of Functioning ("GAF") score of 60 upon discharge.  (R596-97) Pistole presented to Dr. Singh on April 27, 2005, claiming more anxiety, inability to focus, and difficulty sleeping.  (R553)  Dr. Singh added Depakote and Cogentin to his medications.  (R554) On May 9, 2005, Dr. Singh added Klonopin to his regime and increased the doses of Depakote and Lexapro.  (R550-51)

In August 2005, Pistole advised Dr. Reddy that he was doing well.  (R721)  Despite being under some stress as a result of his sister's death, he denied any current hallucinations or paranoid thoughts and that he was taking his medications without experiencing any side effects.  Id.  On January 9, 2006, Dr. Reddy noted that Pistole was taking his medications regularly, had no suicidal/homicidal ideation, and denied anxiety symptoms, mood swings, or hallucinations. (R719) He was hospitalized from February 14, 2006, to February 17, 2006, as a result of a suicide attempt after quitting his job.  (R902) Dr. Pinto diagnosed him as having schizoaffective disorder, currently depressed.  Id.  His treating psychiatrist, Dr. Reddy's, physician progress notes from February 27, 2006, reveal

Pistole's comment that he was doing fine since getting out of the hospital, without psychotic symptoms, anxiety symptoms, or side effects from the medication.  (R723)

In a April 19, 2006, Assessment of Ability to Do Work-Related Activities (Mental), Dr. Pinto found marked limitations to his ability to deal with the public, interact with supervisors, and deal with work stresses as a result of Pistole's fear of unfamiliarity social settings and completing tasks to the degree expected by others; he found no limitation on Pistole's ability to follow work rules, relate to co-workers, or maintain attention/concentration and only slight limitation on his ability to use judgment.  (R726) He would have marked difficulty carrying out complex job instructions, moderate difficulty with carrying out detailed job instructions, but no difficulty carrying out simple job instructions.  (R727)

In a Psychiatric Report dated May 15, 2006, Dr. Reddy stated that he observed no strange posturing or mannerisms, adequate hygiene, appropriate dress, and relevant motor activity.  (R732)    He engaged in activities of daily living including grocery shopping, maintaining hygiene, house work, dishes, vacuuming, sweeping, mopping, preparing meals for himself and his brother, going to church every Sunday, attending youth group meetings at church every Tuesday, watching TV, and reading the Bible.  Id.  Dr. Reddy noted that Pistole had been hospitalized on April 12, 2005, and February 14, 2006, complaining of hearing voices, lack of sleep, anxiety, and depression, for which he was prescribed medication.  Id.  Pistole reported getting along well with his family, as well as getting along with people at church.  (R733) Despite displaying flattened affect occasionally and crying spells, his speech was relevant to the current topic of conversation, coherent, and stayed on task.  Id.  Dr. Reddy related that while Pistole could have hallucinations and confusion to place or time during episodes, he was not currently displaying any difficulty in these

areas.  Id.  Pistole was treated with medication, and Dr. Reddy observed a decrease in depression and psychotic features.  (R735) In conclusion, Dr. Reddy opined that Pistole is "afraid of messing up" when working with the public, but responds well to co-workers and can carry out and understand tasks and instructions.  Id.

On May 22, 2006, Pistole reported that he was taking his medications regularly and sleeping better, denied experiencing mood swings, hearing voices, seeing things, or other psychotic symptoms.  (R750) Dr. Reddy found him to be calm, alert, and oriented, with a bright affect and goal directed thought processes.  Id.  Shortly thereafter, Pistole was psychiatrically hospitalized from May 31, 2006, to June 5, 2006, after claiming that he had attempted another overdose as a suicide attempt.  (R776, R840) Dr. Reddy conducted the initial psychiatric evaluation, noting that he was calm, alert, and oriented with a flat affect and depressed mood, as well as a GAF score of about 45.  (R841-42) On June 27, 2006, Pistole's recovery specialist reported that he was walking to lose weight and getting involved in his church youth group but had not yet attended any of the support groups that she had recommended.  (R996) A July 14, 2006, report by the recovery specialist stated that Pistole has remained stable on his medications and reported that he was doing better with no psychotic symptoms.  (R993) Despite expressing nervousness about working in the community, he was also seeking a referral to community agencies for employment and training opportunities and thought that a job coach might help him.  Id.

On July 24, 2006, Pistole reported that he was doing well on the medication, without symptoms of anxiety or psychosis.  (R1000)  Dr. Reddy found him to be calm, cooperative, alert, and oriented, with bright affect and goal directed thought processes.  Id.  He scheduled Pistole for follow-up in two months and assessed a GAF score of 50.  Id.

However, in contrast to the rather positive progress note from late July, on August 18, 2006, his recovery specialist wrote a letter cosigned by Dr. Reddy confirming without elaboration that Pistole was unable to work at that time and had been hospitalized twice in the last year.  (R846)  On August 31, 2006, Pistole was hospitalized after stating that he had overdosed in another suicide attempt; he was stabilized and referred for inpatient care to reassess his condition.  (R870)

Dr. Reddy's Physician Progress Notes from September 26, 2006, indicate Pistole's report that he was doing fine, with no suicidal ideation, depressive symptoms, anxiety symptoms, or side effects from the medication.  (R1002) Pistole was calm, cooperative, alert, and oriented with bright affect and goal directed thought processes.  Id.  Dr. Reddy assessed his GAF at 50 and schedule a follow-up visit two months later.  Id.

On October 3, 2006, Pistole received an independent psychological evaluation by Dr. Alan Jacobs.  (R847) Pistole advised that his medications have been beneficial, that he generally gets along well with others and is able to make and keep friends, and that most of his episodes of increased anxiety or panic attacks seemed to happen at night. (R848) Dr. Jacobs found that his thinking was cogent, reflecting no delusion, paranoia, or grandiosity.  (R849) Intellectual functioning was within the average range, and Dr. Jacobs concluded that Pistole would be capable of managing his own benefits.  Id.

An October 23, 2006, treatment note reveals that Pistole reported a decrease in symptoms, decrease in anxiety, and no psychotic symptoms in awhile.  (R978) He again requested a referral to the Community Workshop, stating that he had been able to keep a job in the past and was willing to try the SES program.  (R982) He was diagnosed with

major depressive disorder, recurrent, severe with psychotic features and had a GAF score of 50.  (R992)

Pistole was hospitalized again from December 15, 2006, to December 26, 2006. (R985) At that time, he was alert but not oriented to date or place, demonstrating confusion and delay in answering questions, and reported having paranoid, suicidal thoughts and hearing voices.  (R964) Dr. Reddy assessed his GAF score to be 30 at that time.  Id.  By the next day, the consulting physician found him to be alert, oriented, and answering questions appropriately.  (R966) Pistole was discharged on December 26, 2006, with prescriptions for Zoloft, Trazodone, Cogentin, Seroquel, and Wellbutrin.  (R970)

On December 28, 2006, Pistole told Dr. Reddy that he was taking his medications and doing well, with no hallucinations, suicidal ideation, or other side effects.  (R1004) Dr. Reddy found him to be calm, cooperative, alert, and oriented with a bright affect and goal directed thought processes.  Id.  His GAF was assessed at 45, and he was scheduled for a follow-up visit in 4 weeks.  Id.  On January 10, 2007, his recovery specialist noted that following his recent hospitalization, the only symptom of depression that he was experiencing was feeling tired during the day.  (R990) Dr. Reddy recorded that Pistole was doing fine and wanted to continue on his medications in his Physician Progress Notes from January 25, 2007.  (R1006) He was again found to be calm, cooperative, alert, and oriented with a GAF of 35-40.  Id.

In February 2007, his recovery specialist completed an Assessment of Ability to Do Work-Related Activities (Mental) in which she opined that he experienced moderate difficulties in interacting with supervisors, marked difficulties in following work rules, relating to co-workers, and functioning independently, and extreme difficulties in dealing with the

- 15 -

public, using judgment, dealing with work stress, and maintaining attention/concentration. (R972) She found him to be markedly limited in relating predictably in social situations, as well as extremely limited in his ability to carry out even simple job instructions, maintain his personal appearance, behave in an emotionally stable manner, and demonstrate reliability. (R973) However, her clarifying comments in the attached letter indicate that her findings are based largely upon her reactions to the way he responds to her suggestions or generalizations based upon her observations during her encounters with him; for example, she recommended that Pistole not take a third shift job, but he did it anyway or he was hospitalized after he quit taking his medications as directed.  (R975) The recovery specialist further states that his inability to carry out job instructions is limited to when he becomes symptomatic and that he doesn't meet job performance standards because of his poor appearance, lack of sense of direction, and the fact that he becomes easily symptomatic, causing him to become hospitalized.  (R975-76)

The ALJ noted that once placed on medication in April 2005, Pistole's symptoms generally tended to stabilize and he did fairly well for the remainder of the year, working as a houseman in a hotel and as a janitor.  (R288) He has a pattern of doing well for a few months following treatment and hospitalization before he attempts suicide and is admitted to the hospital.  Id.  Based on a review of the medical evidence, the ALJ observed that Pistole functions generally well overall on his medication regimen despite episodic periods of heightened symptoms.  (R289) Evaluation of disability requires consideration of a claimant's functioning on a 12-month basis, not just limited to data from episodic instances of aggravated symptoms.  Id.

Contrary to Pistole's suggestion, the ALJ accepted the opinions of Dr. Reddy and Dr. Pinto with respect to his difficulties in maintaining concentration, persistence, and pace during times of symptom exacerbation, as well as their opinions that he was capable of engaging in simple tasks and carrying out simple job instructions.  The ALJ discounted reliance on the various GAF scores in the record because they were frequently taken during Pistole's periodic episodes of psychotic symptoms and would have necessarily been lower during those limited periods of time than normal.  She further noted that following periods of hospitalization and medication, the GAF scores were considerably higher.   As GAF scores are also influenced by economic factors such as unemployment or homelessness, the ALJ concluded that GAF scores are not a reliable indicator of disability; although the scores were considered, they were not given controlling weight.

The ALJ examined the treatment notes from mental health providers over the relevant period.  The August 18, 2006, letter from Dr. Reddy and the recovery specialist was discounted because it gave no support for the bald conclusion that Pistole was unable to work at that time and did not attempt to indicate why he would be unable to work while following an appropriate medication regimen as he had done successfully in the past.  The ALJ further noted that this letter was somewhat in conflict with their April 19, 2006, report, which found that despite his two hospitalizations, Pistole got along well with others, responds well to co-workers, can carry out and understand instructions, but may have difficulty remembering more complex instructions and becomes anxious when working with the public.  This evaluation would suggest that Pistole retains the ability to perform routine work of a repetitive nature in an environment that does not involve working with the public. The ALJ found no objective evidence in the record indicating that this kind of work would

- 17 -

cause an exacerbation of his legitimate symptoms or that work per se would cause him to have increased symptoms.

The ALJ considered but discounted the February 2, 2007, assessment by the recovery specialist after finding that she was not an acceptable medical source to which deference must be given.  She observed that the statements contained in the assessment were unsupported by medical evidence and appeared to have been made solely for the purpose of helping Pistole obtain disability benefits, focusing solely on his shortcomings rather than on his abilities.  The recovery specialist's claim that he had an extreme limitation in his ability to maintain concentration/ attention or carry out any type of job instructions was found to be inconsistent with his admitted abilities to have worked successfully in the past, play video games, shop and prepare meals, take care of the lawn and household chores, maintain personal hygiene, and otherwise perform the usual activities of daily living.  Upon closer consideration, several of her assertions are couched in terms of the state of his abilities during the occasional periods that he is symptomatic rather than the majority of the time when his symptoms are controlled by medication.  Her claim that Pistole wandered off topic during conversation was contradicted by other evidence in the record, including the observations of his treating physicians and his ability to successfully answer questions during his Administrative Hearing.  In April 2006, Dr. Pinto concluded that he had no limitation in maintaining attention/concentration or in carrying out simple job instructions.  Dr. Reddy echoed these opinions in May 2006 and indicated in his treatment notes through January 2007 that Pistole was generally doing well.  The fact that he worked successfully in December 2006 as a sales associate and from October 2005 through January 2006 as a janitor further demonstrate his ability, while properly medicated,

to maintain some acceptable level of concentration and ability to follow simple job instructions.

The assessments of Dr. Pinto and Dr. Reddy in April and May 2006 respectively were considered and found to be generally consistent with the medical evidence of record. Dr. Pinto's finding that Pistole had a marked limitation in the ability to relate predictably in social situations was inconsistent with evidence of record concerning his ability to get along with co-workers, friends, and relatives, as well as be involved in church activities. Rather the evidence indicates that his problems involve working with the public, when he becomes anxious and overwhelmed. Dr. Pinto presented no medical evidence establishing that Pistole would not be able to perform routine, repetitive work not requiring interaction with the public.

Dr. Reddy consistently noted appropriate hygiene and mannerisms, as well as considerable activities of daily living and the general ability to stay focused during conversation when his symptoms were not episodic. He acknowledged Pistole's ability to get along with family, people at church, and co-workers, as well as his ability to carry out and understand instructions despite the fact that he might have some difficulty remembering some instructions. Pistole's speech was relevant and coherent, and he could stay focused on a conversation with no impairment of thought processes except for his symptomatic episodes. He displayed adequate judgment and the ability to complete simple math calculations.

The ALJ noted the lack of first-hand knowledge by any of these physicians with respect to Pistole's ability to perform his jobs or reasons for quitting. Rather, the treating professionals appeared to rely primarily on Pistole's subjective, self-serving statements.

The opinions also fail to account for the fact that all of his episodes of symptom exacerbation have been brief in duration and have been quickly ameliorated by medication.

An assessment by consultant Leslie Fyans in July 2005 found Pistole to be only mildly restricted in performing the activities of daily living and maintaining concentration, persistence, or pace, and moderately limited in maintaining social functioning. He satisfied neither the B nor C criteria of the listings. Dr. Fyans observed that Pistole responds well to the medication and had normal cognition except when confronted by complex issues. In summary, Dr. Fyans opined that he retained the memory, concentration, ability to adapt and relationships with others commensurate with simple, unskilled work.

The record also contains the assessment by the state agency psychological consultant, Dr. Joseph Mehr, on May, 25, 2006, which found Pistole to suffer from a disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by bipolar syndrome with a history of episodic periods and only one or two episodes of decompensation. Dr. Mehr found him to be only mildly restricted in performing the activities of daily living and maintaining concentration, persistence, or pace, and moderately limited in maintaining social functioning. Based on these findings, Dr. Mehr concluded that Pistole did not satisfy the B criteria for an effective disorder under the listings; he likewise concluded that the C criteria were not satisfied. Dr. Mehr observed from Pistole's treating psychiatrist reports that he was doing fairly well except for mild depressive symptoms and anxiety in social groups where there are stressful demands.

Dr. Mehr found that Pistole had a mental RFC with no significant limitations in the ability to: (1) remember locations and work-like procedures; (2) understand and remember short and simple instructions; (3) carry out short and simple instructions; (4) maintain

attention and concentration for extended periods; (5) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (6) sustain an ordinary routine without special supervision; (7) work in coordination with or proximity to others without being distracted by them; (8) make simple work related decisions; (9) complete a normal work-day and workweek without interruptions from psychologically based symptoms and without an unreasonable number of rest periods; (10) ask simple questions or request assistance; (11) accept instructions and respond appropriately to criticism; (12) get along with coworkers or peers; (13) maintain socially appropriate behavior and basic standards of neatness and cleanliness; (14) respond appropriately to changes in the work setting; (15) be aware of normal hazards and take precautions; (16) travel in unfamiliar places or use public transportation; and (17) set realistic goals or make plans independently.   Pistole was moderately limited in the ability to understand, remember, and carry out detailed instructions, as well as markedly limited in his ability to interact appropriately with the general public.  In summary, Dr. Mehr concluded that Pistole retained the capacity to understand and remember instructions for simple operations of a routine and repetitive nature, but needed to avoid settings in which he would be required to complete tasks that involve interaction with the general public.

A third consultative assessment was completed by Dr. Phyllis Brister on October 27, 2006.  Dr. Brister found him to be mildly restricted in performing the activities of daily living and maintaining social functioning, and moderately restricted in maintaining concentration, persistence or pace.  Based on these findings, Dr. Brister also concluded that Pistole did not satisfy the B or C criteria for an effective disorder under the listings.

Dr. Brister's mental RFC is similar to the mental RFC determined by Dr. Mehr. Dr. Brister concluded that Pistole had a mental RFC with no significant limitations in the ability to: (1) remember locations and work-like procedures; (2) understand and remember short and simple instructions; (3) understand and remember detailed instructions; (4) carry out short and simple instructions; (5) maintain attention and concentration for extended periods; (6) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (7) sustain an ordinary routine without special supervision; (8) make simple work related decisions; (9) complete a normal work-day and workweek without interruptions from psychologically based symptoms and without an unreasonable number of rest periods; (10) ask simple questions or request assistance; (11) get along with coworkers or peers; (12) maintain socially appropriate behavior and basic standards of neatness and cleanliness; (13) respond appropriately to changes in the work setting; (14) be aware of normal hazards and take precautions; (15) travel in unfamiliar places or use public transportation; and (16) set realistic goals or make plans independently. Pistole was moderately limited in the ability to carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, and accept instructions and respond appropriately to criticism. In summary, Dr. Brister opined that he remained cognitively intact and was capable of understanding most instructions but should be limited to simple substantial gainful activity involving simple operations of a routine, repetitive nature in a socially undemanding setting with minimal contact with the general public.

The ALJ acknowledged that when Pistole is symptomatic, he does experience problems with maintenance of concentration, persistence, or pace and social functioning

which would impact his ability to work.  However, as the symptomatic episodes are not overly frequent or of extended duration, his ability to work would not be precluded, as evidenced by his periods of work activity between hospitalizations.  The ALJ further credited Pistole's claim that his symptoms were exacerbated by situations in which he has to work with the general public.

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight so long as it is supported by medical findings and consistent with substantial evidence in the record.  Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008), citing Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004).  The weight to be afforded to the treating physician's opinion depends on consideration of several factors: (1) the length, nature, and extent of the physician and claimant's treatment relationship; (2) whether the physician supported his or her opinions with sufficient explanations and medical findings; (3) and whether the physician specializes in the medical conditions at issue; and (4) the degree of consistency between the opinion and other evidence in the record.  Id.; 20 CFR § 404.1527(d).    "If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ 'minimally articulate[d]' his reasons – a very deferential standard that we have, in fact, deemed lax."  Id., quoting Berger v. Astrue, 5165 F.3d 539, 545 (7th Cir. 2008).

Here, the ALJ concluded that while there is no doubt that Pistole has significant difficulties during periods of symptom exacerbation, may have difficulty executing complex instructions, and experiences substantial stress when required to work with the general public.  To this extent, the ALJ found the opinions of his treating mental health professionals to be credible and consistent with medical evidence of record.  However, in

all other respects,  the opinions of the DDS consulting mental health professionals were more consistent with the evidence of record, including Pistole's own admissions regarding his activities of daily living, the lack of repeated episodes of decompensation of extended duration, his ability to function well and respond to his medication regimen when properly followed, and the representations to and observations of his treating psychiatrist in his physician progress notes. Findings of fact by state agency medical professionals regarding the nature and severity of an individual's impairments were granted probative weight, and the ALJ gave an adequate rationale for these credibility determinations.  As there is substantial evidence in the record upon which the ALJ could base her finding at Step 3 that Pistole did not meet or medically equal a listing, and the ALJ rationally articulated the grounds for her decision, Pistole's appeal in this regard must be denied.

The ALJ next concluded that Pistole was capable of performing past relevant work as a commercial cleaner and that even if he could not perform such work, there are jobs that exist in significant numbers in the national economy that the claimant can perform based on his mental RFC.  Pistole contends that this finding was in error, as the vocational testimony was flawed based on the ALJ's failure to include all of his limitations within the hypothetical question.  However, he does not specify which limitations were allegedly omitted.  The Court presumes that the alleged omissions concern the ultimate conclusions by the treating physicians discussed above.

It was completely proper for the ALJ to omit from the hypothetical any limitations based on statements by Pistole or his physicians which the ALJ found to be not fully credible, assertions entitled to little weight in light of a lack of medical support in the record as a whole, or the unsupported arguments of his attorney.  Ehrhart v. Secretary of Health

and Human Services, 969 F.2d 534, 540 (7th Cir. 1992).  Because substantial evidence supports the ALJ's residual functional capacity finding, her hypothetical question which included the same limitations was appropriate.  "All that is required is that the hypothetical question be supported by the medical evidence in the record."  Meredith v. Bowen, 833 F.2d 650, 654 (7th Cir. 1987); Cass v. Shalala, 8 F.3d 552, 555-56 (7th Cir. 1993).

Pistole challenges the VE's reliance on census codes rather than classifications set forth in the Dictionary of Occupational Titles.  However, in 20 C.F.R. § 404.1566(d)(2)-(3), the Commissioner has expressly taken administrative notice of Census Reports, as well as the Bureau of the Census' publication County Business Patterns.

This is not a case where medical records were insufficient or incomplete, which could necessitate further development of the record.  Rather, the medical records simply failed to compel the conclusion that Pistole was disabled within the meaning of the Act at the time relevant to this application.  Accordingly, the Court must conclude that the ALJ's determination was supported by substantial evidence.

Finally, Pistole contends that additional, new, material evidence that he was found to be disabled on a subsequent application for benefits supports a finding of disability and warrants a remand in this case.  However, this subsequent application expressly rejected the suggestion that his disability began in February 2006 (which is the same date alleged in the application for benefits now before the Court) and concluded that his disability did not begin until April 19, 2007, which is two months after the ALJ conducted the administrative hearing in this case.  This is not the kind of incredibly close timing found by the Court to justify consideration on remand in Martin v. Astrue, Case No. 07-1036, where the claimant

was found to be disabled as of a date that was one day after the date of her administrative hearing.  Accordingly, remand is not appropriate in this case.

## CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment [#14] is DENIED, and the Commissioner's Motion to Affirm [#16] is GRANTED. This matter is now terminated.

ENTERED this 10th day of August, 2010.


s/ Michael M. Mihm
Michael M. Mihm
United States District Judge